The BALTIMORE & OHIO RAILROAD COMPANY, Plaintiff,

v.

OWENS–ILLINOIS GLASS COMPANY, Defendant.

The PENNSYLVANIA RAILROAD COMPANY, Plaintiff,

v.

OWENS–ILLINOIS GLASS COMPANY, Defendant. .

Civ. Nos. 6315, 6339.

United States District Court
N. D. Ohio, W. D.
Oct. 29, 1954.

The following is the opinion of Special Master, Fred H. Kruse, in the court below:

To the Honorable Frank L. Kloeb, United States District Judge:

1. The undersigned, to whom as special master the above consolidated cause was referred, to hear witnesses and to receive and consider testimony, affidavits, exhibits and other proofs, arguments of counsel, and any and all matters relating to the questions involved or the issues raised in this cause, and to rule upon the admissibility of evidence but to preserve such evidence as counsel may demand which the special master deems inadmissible, together with his ruling, for ultimate and final ruling by the Court, and to file and report to the Court his findings of fact and conclusions of law, together with all the evidence and exhibits presented, offered and considered by him, and to file with this Court his report and opinion, giving his reasons and conclusions, along with his recommendations concerning the final disposition of this cause, subject to the final, ultimate full review and determination of the Court, begs leave to report as follows:

2. The cause came on for hearing on July 21 and 22, 1953, at which Mr. Joel S. Rhinefort appeared on behalf of The Baltimore & Ohio Railroad Company, Mr. Robert B. Gosline on behalf of The Pennsylvania Railroad Company, and Messrs. John F. Finerty and Frank A. Harrington on behalf of Owens-Illinois Glass Company. Some delay has been occasioned by the time consumed in preparing and filing briefs, the last contribution being filed March 3, 1954.

### The Pleadings

3. The complaint of The Baltimore & Ohio Railroad Company alleges there is due to it from the defendant, for additional freight charges and federal taxes, on account of the failure of the defendant to pay the rates prescribed in lawful tariffs on file with the Interstate Commerce Commission, on shipments of glass sand to the defendant, between the dates of January 13, 1948, and July 11, 1948, the sum of $5700.36 (Sched. "A" to B. & O. Stipulation). The Pennsylvania Railroad Company alleges there is due to it on similar shipments the sum of $2588.66 (R. 3; Exs. A, B and C). There is no dispute as to the amounts.

4. The answers of the defendant allege that it has paid to the plaintiffs all the charges lawfully applicable to the shipments in question together with the federal taxes thereon, and that the addi-

tional charges which the plaintiffs seek to recover are in excess of the lawful charges specified and provided by the lawfully applicable tariffs.

5. While it is denied in the answer in the Pennsylvania case that the shipments referred to could be described under the applicable tariffs as "glass sand" or other than as "sand", it has been conceded by formal admission that the sand in question shipped to defendant was "sand suitable for the manufacture of glass and was used in the manufacture of glass by the defendant", and that the silica content of the sand was 80% or greater. (Request for Admissions and Reply under Rule 36; Pennsylvania Stipulation, pars. 18, 19). Defendant also stated in its trial brief on this point:

Defendant "is willing that the court should assume, for the purpose of determining the questions of tariff construction here in question, that defendant's shipments of sand did consist of 'glass sand' and of 'silica sand' ". (Page 9).

### The Issues

6. The two cases here, which will be referred to as the "Baltimore & Ohio" case and the "Pennsylvania" case, are based on claims of the same character against the same defendant and involve the same issues.

7. The issue in controversy here was litigated and determined before the Interstate Commerce Commission in Anchor Hocking Glass Corporation, et al. v. Baltimore & Ohio Railroad Co., et al., 283 ICC, 393, Case No. 30,614 (1952), to which the plaintiffs and the defendant here were parties. Petitions for re-opening, re-consideration and re-argument filed before the Commission were denied, and its decision has apparently become final in those proceedings. It does not appear that any attempt was made to review this determination under the provisions of Title 28, U.S.C.A. § 1336, which, it seems, could have been done. See United States v. Interstate Commerce Commission, 337 U.S. 426, 440, 443, 69 S.Ct. 1410, 93 L.Ed. 1451.

8. In that case, the various glass companies, including the defendant, paid the increases claimed by the railroads and then brought claims before the Commission for reparation under the law, 49 U.S.C.A. § 9. So far as appears, the same contentions were made in that case as are made here. The shipments of glass sand involved in that case moved during the same periods as the shipments here in question, and were subject to the same tariffs as the shipments in this case. The Commission decided in favor of the railroads and denied the claims.

9. The first question presented is whether or not the decision of the Interstate Commerce Commission is controlling on this court. Should that issue be determined in favor of the plaintiffs, that would seem to dispose of this case. However, should the court conclude otherwise and find with the defendant that there is presented a question of law of which this court has jurisdiction and that this court must make its own independent examination and construction of the tariff, notwithstanding the determination by the Interstate Commerce Commission, it will be necessary to determine the meaning of the words of the tariffs involved and to apply that meaning to the undisputed facts.

10. The subject matter of the controversy is the question of what increases in the basic rates on glass sand were applicable on shipments to defendant of glass sand moving during the period of January 13, 1948, to July 11, 1948, by reason of tariff increases authorized by and filed with the Interstate Commerce Commission by the two plaintiff railroads.

11. The plaintiffs contend that the proper increases on the shipments in question, under the applicable tariffs, from January 13, 1948, to May 5, 1948, were 20% with a maximum of 60 cents per net ton, and from May 6, 1948, to July 11, 1948, 30% with a maximum of 66 cents per net ton. On the other hand, defendant contends that the proper increase for the first period was 20% with a maximum of 30 cents, and 30%

with a maximum of 33 cents for the latter period.

12. The tariffs applicable to the shipments here, as in the Anchor Hocking case, were the base rate tariffs, previously in effect and concerning which there is no question, in which the commodity description covering the defendant's shipments was listed generally as "sand", and two master tariffs of increased rates (Exs. K and L), covering the periods January 13 to May 5, 1948, and May 6 to July 11, 1948, in which the commodity description to which increases of 30 cents and 33 cents per net ton were applied was listed as "sand or gravel * * * Noibn, in bulk or open cars", or "sand or gravel * * * Noibn, in closed cars" ("Noibn" meaning "Not otherwise indexed by name and not more specifically provided for in the master tariffs"), and the commodity description to which the increases of 60 cents and 66 cents per net ton were applied, so far as applicable here, was listed as "glass" or "silica" sand.

13. Counsel for defendant contend that Item 10–B of master tariff Ex. K, p. 3, and Rule 1(a) of master tariff Ex. L, p. 18, provide for first ascertaining the amount of tariff charges without reference to the master tariffs; that there was no commodity description of "glass" or "silica" sand in the base tariffs to which the increases of 60 cents and 66 cents per net ton in the master tariffs could be applied, and, therefore, there was no commodity description in the base rate tariffs which covered the defendant's shipments except "sand", on which the applicable increases were 30 and 33 cents per net ton on "sand * * * Noibn, in closed cars".

14. The defendant's contention is epitomized by the statement (Brief, p. 37) that the "very limited and relatively simple question of tariff construction which this court is called upon actually to decide"—

"is whether or not the higher increases, which plaintiffs' Master Tariffs purported to publish on 'glass' sand and 'silica' sand are legally applicable to the concededly applicable commodity descriptions and to the rates and charges in connection therewith, published in plaintiffs' Base-Rate Tariffs, which commodity descriptions are based solely on equipment distinctions, and contain no such terms as 'glass' or 'silica' sand."

15. The Commission disposed of this contention in its report (Commission Finding 15 herein) as follows:

"The complainant's contention that the description 'sand * * * Noibn, in closed cars', in the master tariffs of increased rates and charges was literally applicable to the rates on sand, in closed cars, published in the base-rate tariffs, is unsound. It ignores the definition of the term 'Noibn' in the master tariffs, which definitely precludes the use of such description on sand therein otherwise indexed by name, including glass sand, and would wholly nullify the master tariffs in respect of glass sand and most of the other kinds of sand therein indexed by name."

16. Most of the material facts have been stipulated by the parties. There is no dispute concerning the applicable tariffs. The defendant in one of its briefs stated as to the issues (Defendant's Trial Brief, p. 7):

"The defendant will submit, therefore, that since the *tariff provisions in question are unambiguous,* and since *there is no dispute of fact as to the meaning of any of the words used in them, or as to the assumed character of the defendant's shipments of sand as 'glass sand' or 'silica sand',* the proper construction of such tariffs, as to which bases of maximum increases are published in them as applicable to defendant's shipments of sand, is a question of law to be determined by the court solely by an inspection of the tariff provisions themselves." (Italics added).

*The Effect of The Decision of The Interstate Commerce Commission in Anchor*

*Hocking Glass Corporation et al. v. The Baltimore & Ohio Railroad Company et al., Case No. 30,614, 286 I.C.C. 393.*

17. It is admitted that this case involved the same problem, the same basic facts and the same parties as the case at bar, although in that case the parties were reversed, because the glass companies were seeking to recover the increased tariff charges which they paid under the same tariffs as the tariffs in this case under which the plaintiffs are seeking to recover the additional increased tariff charges which the defendant here has refused to pay. While the shipments here were made in the same territory, they were between different points, but that difference has no effect on the question involved.

18. Counsel for the railroads contend that it is the established doctrine that if a controversy over tariff interpretation requires the consideration of matters of fact and the application of expert knowledge, the determination of the controversy and the construction of the tariff are within the primary jurisdiction of the Interstate Commerce Commission, and its decision is controlling of the case at bar, citing: Standard Oil Co. (Indiana) v. United States, 1931, 283 U.S. 235, 238, 51 S.Ct. 429, 75 L.Ed. 999; Great Northern Ry. Co. v. Merchants' Elevator Co., 1922, 259 U.S. 285, 42 S.Ct. 477, 66 L.Ed. 943; Texas & Pacific Ry. Co. v. American Tie & Timber Co., 1914, 234 U.S. 138, 34 S.Ct. 885, 58 L.Ed. 1255; Texas & Pacific Ry. Co. v. Abilene Cotton Oil Co., 1907, 204 U.S. 426, 27 S.Ct. 350, 51 L.Ed. 553; Old Colony Furniture Co. v. United States, D.C., 1951, 95 F. Supp. 507.

19. Counsel for plaintiffs contend that the determination by the Interstate Commerce Commission is controlling for the reason that the Commission had to consider matters of fact and extrinsic evidence and applied its expert knowledge in order to determine the issue involved; that its decision involved questions of fact as to the type of sand shipped, the intent of the railroads in their petition for increase and the intent of the Commission in granting such increase, the reason for the difference in rates when different equipment was used, and the technical meaning of the term "Noibn" used in the master tariffs; whereas, in the cases relied on by counsel for defendant, the interpretation of the tariff involved only the construction of plain and ordinary language and did not involve the examination of facts and extrinsic evidence.

20. Counsel for defendant contend, on the other hand, that a District Court is not bound by a prior determination of a question of tariff construction by the Commission, so as to oust the court of jurisdiction to decide for itself, independently, such question of tariff construction, where, as they claim here, there is no dispute either of fact or of the technical meaning of words nor any administrative matter involved, but only a question of law as to the construction of the tariff, citing Brown & Sons Lumber Co. v. Louisville & Nashville Ry. Co., 1937, 299 U.S. 393, 57 S.Ct. 265, 81 L.Ed. 301 and Great Northern Ry. Co. v. Merchants' Elevator Co., 1922, 259 U.S. 285, 42 S.Ct. 477, 66 L.Ed. 943.

21. It may be useful at this point to refer to the report of the Commission in the Anchor Hocking case (286 ICC, 393, Case No. 30,614), to which both plaintiffs and defendant were parties, to ascertain what the Commission there considered and decided. The complainants in that case, manufacturers of glass containers at certain points in Indiana, Ohio, West Virginia, New York, Pennsylvania and New Jersey, alleged that rates in excess of the applicable rates were charged by the defendant railroads on sand (other than ground or pulverized sand or bonded molding sand), in closed cars or in open cars with tarpaulin or other protective covering, shipped on and between January 13, and July 11, 1948, from producing points in official territory to complainants' plants at points in the above named States. The shipments there involved were of "glass" or "silica" sand, as here, and were made during the same periods and were subject to the same

tariffs as in this case. The Commission found in favor of the carriers and dismissed the complaints, its order in the case reading as follows:

"No. 30614.
Anchor Hocking Glass
Corporation et al.
v.
Baltimore & Ohio Railroad
Company et al.

This proceeding being at issue upon complaint and answers on file, and having been duly heard and submitted by the parties, and full investigation of the matters and things involved having been made, and said division having, on the date hereof, made and filed a report containing its findings of fact and conclusions thereon, which report is hereby referred to and made part hereof:

*It is ordered,* That the complaint in this proceeding be, and it is hereby, dismissed.

By the Commission, division 3."

22. The findings and conclusions of the Commission were as follows:

23. (1) The shipments received by the complainants in this proceeding consisted of sand (other than ground or pulverized sand and bonded molding sand), in closed cars or in open-top cars with tarpaulin or other protective covering, shipped on and between January 13, 1948 and July 11, 1948, and used in the manufacture of glass containers. The sand was variously described in the purchase orders as white silica sand, silica sand, dry sand, washed and dry sand, white sand, flint glass sand, amber sand, damp sand, flint sand, or sand. Sand suitable for the manufacture of glass is known commercially, and described in recognized trade and industrial publications, as glass sand, and the sand comprising these shipments came within that description. The silica content of this sand generally ranged from about 80 to 90 percent. The major portion was of high silica content. Uniformity of silica content within the aforesaid range is more important than high silica content, in that it enables the manufacturer better to control the operation of his plant. The 80 percent silica-content sand usually contains one or more other elements such as lime, alumina, and alkalis, which are used in the production of glass. No specifications as to the silica content and other ingredients of this sand are employed by the glass manufacturer when placing an order with the producer, but before he contracts to purchase the sand, the glass manufacturer obtains from the producer an analysis as to the composition of the sand.

24. (2) The shipments moved in closed cars or in open-top cars with tarpaulin or other protective covering over the lines of the defendants during the period covered by the complaint from various producing points in official territory to Dunkirk, Muncie, Indianapolis, Winchester, Gas City, and Terre Haute, Ind., Zanesville, Lancaster, Toledo, and Columbus, Ohio, Washington, Pa., Huntington, Fairmont, Owens, Elmira, N. Y., and Millville, N. J. Charges were collected at the basic rates on sand, in closed cars, in effect on October 12, 1947, plus the so-called interim increases of 20 percent, maximum 60 cents a net ton, during the period January 13, 1948 to May 5, 1948, inclusive, and 30 percent, maximum 66 cents a net ton, during the period May 6, 1948 to July 11, 1948 inclusive.

25. (3) The complainants contend that the applicable rates were the basic rates on sand, in closed cars, in effect on October 12, 1947, plus increases of 20 percent, maximum 30 cents a net ton, during the first-named period, and 30 percent, maximum 33 cents a net ton, during the second period. The question for determination is whether the higher or the lower of the maximum increases were applicable on the shipments.

26. (4) The base rates on sand were published by the defendants in one set of tariffs, and the interim or emergency increases in those rates were published in separate or so-called master tariffs

which were made a part of the base-rate tariffs by appropriate cross reference, effected by the publication of so-called link supplements to the base-rate tariffs. In the base-rate tariffs, sand, other than ground or pulverized sand and bonded molding sand, was described in terms of the equipment used to transport it, in substantial conformity with the findings in Industrial Sand Cases, 1930, 204 ICC, 159. The master tariffs described certain kinds of sand, including glass sand, by name, and other sand in terms of the equipment used to transport it. The following are illustrative of the commodity descriptions in the base-rate tariffs and those in the master tariffs during the period covered by the complaint:

27. (5)

| Commodity descriptions in the base-rate tariffs | : | Commodity descriptions in the master tariffs | : | Maximum increase per net ton | |
|---|---|---|---|---|---|
| | | | | January 13 to May 5, 1948 [1] | May 6 to July 11, 1948 [2] |
| | | | | Cents | Cents |
| 1. *Sand* (other than ground or pulverized or molding, bonded (naturally or otherwise), in open-top equipment. Rates will not apply on shipments in cars with tarpaulin or other protective covering. In such instances the rates applicable on shipments in closed cars are to be assessed. | | Item No. 245 (280) Sand or gravel, NOIBN[3], in bulk in open cars. | | 30 | 33 |
| | | Item No. 246 (285) Sand or gravel NOIBN[3], in closed cars. | | 30 | 33 |
| 2. *Sand* (other than ground or pulverized or molding, bonded (naturally or otherwise), in closed cars or in tank cars. *Sand,* molding, bonded (naturally or otherwise), in open top cars, closed cars, or in tank cars. | | Item No. 247 (290) Sand, viz: Blast Loam Core Molding, Filtering bonded Fire (naturally Furnace or otherwise) Foundry Molding, NOIBN Glass Polishing Grinding Pulverized Ground Silica | | 60 | 66 |

3. *Sand,* ground or pulverized

1 — Published in the master tariff under the general heading "Maximum increases to be applied as provided in item No. 10–B or reissues of such item."

2 — Published in the master tariff under the general heading "Increases in applicable line-haul carload rates on commodities named in Items Nos. 90 to 400, inclusive."

3 — Not otherwise indexed by name and not more specifically provided for in the master tariffs.

28. (6) The master tariff of increased rates and charges in effect during the period January 13 to May 5, 1948, provided in item 10–B thereof for the application, in the nature of a surcharge, of the interim increases published therein to the line-haul rates on the commodities on which rates were published in the base-rate tariffs. In other words, that item in substance directed that the amount of the charges for line-haul transportation should first be ascertained without reference to the master tariff, and that the amount so ascertained should then be increased by the percentage there stated, but not to exceed the amount which would result from the maximum increase, if any, named in

certain other items, including items 245, 246, and 247, above set forth.

29. (7) The master tariff of increased rates and charges in effect from May 6 to July 11, 1948, inclusive, differed from the preceding issue of that tariff, in that it set forth in tabular form amounts corresponding, respectively, to those of the basic rates and the increased rates resulting from the application to the basic rates of the interim increases, subject, in certain instances, to maximum increases on certain commodities, including sand, authorized by the Commission's report and order of April 13, 1948, in Ex Parte No. 166. The commodity descriptions of sand, which were set forth in items 280, 285 and 290 of that tariff, were the same as those in items 245, 246 and 247 of the preceding master tariff of increased rates and charges. The commodity descriptions in the contemporaneous base-rate tariffs were the same as those set forth in the preceding table.

30. (8) By supplement to the latter master tariff of increased rates and charges, effective July 12, 1948, the descriptions of sand in that tariff were amended to conform substantially to those in the base-rate tariffs on that commodity; that is, sand, other than ground or pulverized sand and bonded molding sand, was described in terms of the equipment used to transport it.

31. (9) The commodity descriptions of sand published in the master tariffs of increased rates and charges during the period covered by the complaint had their inception in Ex Parte Nos. 148 and 162. In their petition of April 15, 1946, for example, which resulted in the institution of the investigation in Ex Parte No. 162, the defendants, in describing sand, employed commodity class or group numbers originally prescribed by order of Division 4 on November 22, 1927, for the compilation of freight traffic statistics. In its report of December 5, 1946, in Ex Parte No. 162, the Commission adopted those commodity class or group numbers in authorizing certain general increases in the rates on sand, namely,

"gravel and sand—Group 350" and "industrial sand—Group 392". In publishing those increases in their master tariff of increased rates and charges, the defendants substituted item numbers for the commodity class or group descriptions. Those descriptions, with certain changes, some of which were in part stated in terms of the equipment used in transporting sand, were carried forward under corresponding item numbers in supplements to that tariff until the latter was reissued on July 12, 1948, and provision made for the application of the increases published therein on sand, other than ground or pulverized sand and bonded molding sand, in terms of the equipment used to transport it.

32. (10) The item numbers and some of the earlier commodity descriptions of sand theretofore used by the defendants in publishing increases under Ex Parte No. 162, which did not distinguish sand in terms of the equipment used to transport it, were employed in the defendants' petition of July 3, 1947, for further general increases in the rates on this and other traffic, which resulted in the investigation in Ex Parte No. 166. These same item numbers and commodity descriptions of sand were likewise employed by the defendants in subsequent amendments to their petition in that proceeding filed on September 5 and December 3, 1947. In the report of December 29, 1947, on further hearing, in Ex Parte No. 166, the Commission authorized a temporary increase of 20 percent in the basic rates on sand, among other commodities, in lieu of a temporary increase of 10 percent previously granted in that proceeding, and by permissive order issued on January 2, 1948, under section 6 of the act, further authorized the publication of maximum increases on certain commodities, including sand, of 60 cents a net ton on sand (foundry, glass, molding, etc.) and 30 cents a net ton on sand and gravel, n. o. i. b. n., proposed in the defendants' petition in that proceeding, which was filed on September 5, 1947. In a supplemental report of April 13, 1948, on further hearing in that

proceeding, the findings in the prior report were modified, and, in lieu of the interim increases theretofore permitted, the Commission authorized, pending its further order, an increase of 30 percent in the basic rates on sand within official territory, subject to the maximum increases proposed in the defendants' amended petition of December 3, 1947, namely, 66 cents a net ton on sand (foundry, glass, molding, etc.) and 33 cents a net ton on sand and gravel, n. o. i. b. n. The descriptions of sand used by the defendants in their master tariff of increased rates and charges, in publishing the increases in the rates thereon pursuant to the aforesaid authorizations, are those hereinbefore set forth.

33. (11) In the final report of July 27, 1948, in Ex Parte No. 166, the Commission authorized the same general increase of 30 percent in the basic rates on sand within official territory as it had allowed in the prior report of April 13, 1948, subject to a maximum of 1.5 cents per 100 pounds (30 cents a net ton) on sand and gravel, all kinds, not otherwise specified in that finding, but not including ground or pulverized sand or gravel, in open cars, with the lading not protected by tarpaulins or similar coverings; 3 cents per 100 pounds (60 cents a net ton), in closed cars, or in open cars with the lading protected by tarpaulins or similar coverings; and 3 cents per 100 pounds (60 cents a net ton) on naturally or artificially bonded molding sand. That report for the first time thus specifically authorized a higher maximum increase on sand, in closed cars or in open cars with protective covering than on sand in open cars without protective covering, and also described sand, except naturally or artificially bonded sand and ground or pulverized sand, in terms of the equipment used to transport it, in conformity, with the descriptions of this commodity in the defendants' base rate tariffs.

34. (12) These complainants concede that the defendants requested and that the Commission granted, authority to make higher maximum increases applicable on the sand comprising these shipments, and that the defendants, in publishing their master tariffs of increased rates and charges, intended to make such higher maximum increases applicable on this sand. They rely on decisions (Chase & Company, Inc. v. Atlantic Coast Line R. Co., 220 I.C.C. 398, 400, by Division 4, and proceedings referred to therein) to the effect that the legal rates are those actually published in the carriers' tariffs and not necessarily those which the carriers intended to publish in accordance with authority granted.

35. (13) The defendants' base rate tariffs in effect during the period covered by this complaint contained rates on sand, with certain exceptions not here material, described in terms of the equipment used to transport it, and there were no rates published therein on sand described or indexed by name as "glass" sand or "silica" sand. The position of these complainants is that there were, therefore, no rates on sand in those tariffs to which the higher maximum increases on sand described in the master tariffs of increased rates and charges as glass or silica sand could be applied; that those higher maximum increases were inapplicable, and that the lower maximum increases on sand, described in the master tariff as "sand * * *, Noibn, in closed cars", were applicable.

36. (14) We have frequently found that all of the pertinent provisions of tariffs must be considered together and if those provisions may be said to express the intention of the framers under a fair and reasonable construction that intention must be given effect, and that shippers are bound by the words employed and are not at liberty to conjure up conditions to raise doubts in order that resort may be had to a contrary construction. Hill Motor Car Co. v. Michigan Central R. Co., 197 I.C.C. 259.

37. (15) The generic term "sand" in the base-rate tariffs included all kinds of sand, except ground or pulverized sand and bonded molding sand, and therefore embraced glass sand. That this was the meaning of the term is indicated by the

fact that prior to the establishment of rates on this traffic, based on equipment distinction, pursuant to the findings in Industrial Sand Cases, 1930, supra, glass sand generally was so described in the defendants' tariffs. The complainants' contention that the description "sand * * *, Noibn, in closed cars", in the master tariffs of increased rates and charges was literally applicable to the rates on sand, in closed cars, published in the base-rate tariffs, is unsound. It ignores the definition of the term "Noibn" in the master tariffs, which definitely precludes the use of such description on sand therein otherwise indexed by name, including glass sand, and would wholly nullify the master tariffs in respect of glass sand and most of the other kinds of sand therein indexed by name.

38. (16) We find that the rates charged on shipments of sand embraced in the complaint in No. 30614 were applicable.

■ 39. As to the findings of fact in the report of the Commission above set forth, it would seem that this court is bound by such findings. Brown & Sons Lumber Co. v. Louisville & Nashville R. Co., 6 Cir., 1936, 82 F.2d 94, affirmed 299 U.S. 393, 57 S.Ct. 265, 81 L.Ed. 301, where the court held:

"Circuit Court of Appeals is bound by decision of Interstate Commerce Commission on question of fact, or question involving exercise of administrative discretion."

We come now to a discussion of the cases cited and relied on by counsel for plaintiffs.

40. The case of Standard Oil Co. (Indiana) v. United States, 283 U.S. 235, 51 S.Ct. 429, 75 L.Ed. 999, was a suit in equity brought by the plaintiff to enjoin and annul an order of the Commission dismissing the complaints filed with it by the plaintiff to recover damages for alleged overcharge on petroleum products from points west of the Mississippi River to various eastern destinations. (113 I.C.C., 597; 139 I.C.C., 297). A 3-judge

court dismissed the action, D.C.Ind., 1930, 41 F.2d 836, holding that, under Title 49 U.S.C.A. § 9, a plaintiff had the right and privilege originally either to make complaint to the Commission or to bring suit in a United States Court of competent jurisdiction for the recovery of the damages it claimed to have sustained, but had not the right to pursue both remedies, and, having elected to make complaint to the Commission and having obtained the Commission's decision, the plaintiff had "exhausted its rights and may not now in the courts pursue the alternative remedy". This action was affirmed by the Supreme Court, that court holding that the District Court had no jurisdiction because of the provisions of Title 49 U.S.C.A. § 9, under the terms of which the plaintiff was precluded from seeking reparations upon the same claims it brought before the Commission by the alternative method of filing an action in the District Court.

This case would seem to have no application on the facts to the case at bar.

41. Great Northern Ry. Co. v. Merchants' Elevator Co., 259 U.S. 285, 291, 42 S.Ct. 477, 66 L.Ed. 943, cited by counsel on both sides, was an action brought by the elevator company in a state court of Minnesota against the railway company to recover an alleged overcharge. Whether or not the disputed charge was payable depended solely upon the construction of the tariff rule of the carrier, that is, whether the body of the rule or the exception to it applied. The carrier claimed that until the true construction of the tariff had been determined by the Commission, the trial court was without jurisdiction. There was no apparent dispute concerning the facts, the question being whether any court had jurisdiction of the controversy in view of the fact that the Commission had not passed upon the disputed question of construction. It was there said:

"Whenever a rate, rule, or practice is attacked as unreasonable or as unjustly discriminatory, there must be preliminary resort to the Com-

mission. Sometimes this is required because the function being exercised is in its nature administrative in contradistinction to judicial. But ordinarily the determining factor is not the character of the function, but the character of the controverted question and the nature of the enquiry necessary for its solution. To determine what rate, rule or practice shall be deemed reasonable for the future is a legislative or administrative function. To determine whether a shipper has in the past been wronged by the exaction of an unreasonable or discriminatory rate is a judicial function. Preliminary resort to the Commission is required alike in the two classes of cases. It is required because the enquiry is essentially one of fact and of discretion in technical matters; and uniformity can be secured only if its determination is left to the Commission. Moreover, that determination is reached ordinarily upon voluminous and conflicting evidence, for the adequate appreciation of which acquaintance with many intricate facts of transportation is indispensable, and such acquaintance is commonly to be found only in a body of experts. *But what construction shall be given to a railroad tariff presents ordinarily a question of law which does not differ in character from those presented when the construction of any other document is in dispute.*" 259 U.S. at page 291, 42 S.Ct. at page 479. (Italics added.)

"In the case at bar the situation is entirely different from that presented in the American Tie & Timber Co. Case, or in the Loomis Case, [Loomis v. Lehigh Valley R. Co., 240 U.S. 43, 36 S.Ct. 228, 60 L.Ed. 517]. *Here no fact, evidential or ultimate, is in controversy; and there is no occasion for the exercise of administrative discretion. The task to be performed is to determine the meaning of words of the tariff which were used in their ordinary sense and to apply that meaning to the undisputed facts.* That operation was solely one of construction; and preliminary resort to the Commission was, therefore, unnecessary. * * *" 259 U.S. at page 294, 42 S.Ct. at page 480. (Italics added.)

In the case at bar, as in the above case, there are no facts in controversy, so that the only question is one of law as to the construction of the tariff.

42. The case of Texas & Pacific Ry. Co. v. Abilene Cotton Oil Co., 1906, 204 U.S. 426, 27 S.Ct. 350, 51 L.Ed. 553, was one in which plaintiff sought in a state court to recover alleged overcharges on shipments of cotton seed over the line of the defendant's road, on the ground that the payment was based upon an unjust and unreasonable rate, that it was discriminatory and constituted an undue preference. The Railway Company defended on the ground that the shipments were interstate and covered by the Interstate Commerce Act. The court in that case established the so-called "primary jurisdiction" doctrine, which has been referred to as an excellent example of judicial legislation (Davis on Administrative Law, page 665, 1951), holding that a shipper cannot maintain an action at comon law in a state court for excessive and unreasonable freight rates on interstate shipments where the rates charged were those which had been duly fixed by the carrier according to the Act and had not been found to be unreasonable by the Interstate Commerce Commission. The decision of the lower court, 38 Tex.Civ.App. 366, 85 S.W. 1052, was reversed.

It would not seem that the law of this case has any pertinent application to the issue in the case at bar.

43. In Texas & Pacific Ry. Co. v. American Tie & Timber Co., 1914, 234 U.S. 138, 34 S.Ct. 885, 58 L.Ed. 1255, the shipper commenced an action in the Federal Court against the carriers to recover damages alleged to have resulted from the refusal of the Railway Com-

pany to furnish cars for the loading of railway crossties at various points on the lines of the carriers for shipment beyond the lines of the companies. A plea to the jurisdiction by one of the carriers was sustained, resulting in the suit being dismissed as to it. There was a trial of the cause of action against the Texas & Pacific Ry. Co., resulting in a judgment against it, affirmed by the court below 5 Cir., 190 F. 1022, which was reversed by the Supreme Court. The pivotal question in the case was whether crossties were included in the tariff rate on lumber, as to which there was irreconcilable conflict in the testimony. The court held that "whether crossties are or are not lumber and therefore within the tariffs filed for the latter is a question on which there is great diversity of opinion even among experts on the subject, and one that should be determined in the first instance by the Interstate Commerce Commission".

44. With reference to the primary jurisdiction of the Interstate Commerce Commission, the court said:

> "There is no room for controversy that the law required a tariff, and therefore, if there was no tariff on cross-ties, the making and filing of such tariff conformably to the statute was essential. And it is equally clear that the controversy as to whether the lumber tariff included cross-ties was one primarily to be determined by the Commission in the exercise of its power concerning tariffs and the authority to regulate conferred upon it by the statute. Indeed, we think it is indisputable that that subject is directly controlled by the authorities which establish that, for the preservation of the uniformity which it was the purpose of the act to regulate commerce to secure, the courts may not, as an original question, exert authority over subjects which primarily come with the jurisdiction of the Commission." (Citing cases.) 234 U.S. at page 146, 34 S.Ct. at page 888.

It would seem that the "primary jurisdiction" doctrine has no application here in any event, because the Commission had previously determined the questions involved in the Anchor Hocking case.

45. In Old Colony Furniture Co. v. United States, D.C.Mass., 1951, 95 F.Supp. 507, the plaintiffs filed a claim with the Interstate Commerce Commission to recover reparation for alleged overcharges, under Title 49, U.S.C.A. § 9. The question at issue was which of two commodity descriptions in the tariff was applicable to wooden automobile parts which were covered with a coat of sealer material, a coat of primer material and a coat of lusterless enamel, the determination of which depended upon whether the parts were "painted" or "preservatively treated". The Commission dismissed the claim, holding that the paint was not a preservative within the meaning of the tariff descriptions but only a protective covering, and that the tariff item applicable to painted parts was properly applied. The shipper then began an action to set aside the order of the Commission (as might have been done in this case), and the railroads intervened. The District Court sustained the Commission's finding and order and held that the only question open to review was whether the order of the Commission was entered arbitrarily, without substantial supporting evidence or in defiance of law and that its findings of fact as to the meaning of words in industrial usage were supported by substantial evidence and were adequate to sustain the Commission's ruling as to which item of tariff was applicable. It further held, under the decision in United States v. Interstate Commerce Commission, 337 U.S. 426, 69 S.Ct. 1410, 93 L.Ed. 1451, that the order of the Commission dismissing the shipper's claim for damages under Title 49, U.S.C.A. § 9, was an order subject to challenge under Title 28, Sec. 1336, U.S.C.A.

46. We cannot agree with the contention of counsel for the plaintiffs that the determination by the Interstate

Commerce Commission should be considered as controlling on this court for the reason that the case there was one within the primary jurisdiction of the Commission in which it had to consider matters of fact and extrinsic evidence and applied its expert knowledge in order to determine the issue involved; that its decision involved questions of fact as to the type of sand shipped, the intent of the railroads in their petitions for increase and the intent of the Commission in granting such increase, the reason for the difference in rates when different equipment was used, and the technical meaning of the term "Noibn" used in the master tariffs. It seems to us that these contentions cannot be sustained, because these matters were not in controversy in this case. As to the type of sand shipped, it is admitted by defendant for the purposes of this case, as it seems to have been admitted in the Anchor Hocking Case before the Commission, that the shipments in question consisted of "glass" sand, so that there is no question of fact involved on this point. As to the matter of intent of the railroads to apply for and of the Commission to grant increases in the tariff rates on glass sand, that appears to have been admitted by the complainants in the Anchor Hocking Case as well as in this case, but that the purpose was accomplished by the action taken is denied. Furthermore, the intent would seem to be immaterial on the issues here for the reason that it seems to be the law that it is the language actually used in the tariffs legally authorized and published that governs the rate upon the commodity shipped, and that the "carrier's intention is pertinent only so far as fairly expressed". Atlantic Bridge Co. v. Atlantic Coast Line R. Co., D.C.Fla., 1932, 56 F.2d 163. As to the meaning of the term "Noibn", there seems to have been no controversy in the Anchor Hocking Case, and certainly none in the case before us, that the meaning of this term was any different than the definition given in the tariffs themselves, where this term, although technical and needing an explanation standing by itself, is stated to mean as follows:

"Except where otherwise specifically provided in particular items, where the term 'Noibn' is used, it means not otherwise indexed by name and not more specifically provided for in Tariff of Increased Rates and Charges No. X–162–A as described in Item No. 5." (Exhibit K, Page 6; Exhibit L, Page 35).

■ 47. It therefore seems that there is involved here no dispute, either of fact or of the technical meaning of words nor is there any matter of administrative judgment involved, but only a question of law as to the construction of the tariff, of which this court has independent jurisdiction.

48. The principal case relied upon by counsel for the defendant is Brown & Sons Lumber Co. v. Louisville & Nashville Railroad Co., 1936, 299 U.S. 393, 57 S.Ct. 265, 81 L.Ed. 301. In that case the lumber company and other shippers filed with the Interstate Commerce Commission a complaint under Section 16(2), 49 U.S.C.A., seeking reparation for alleged overcharges on shipments of lumber and other forest products taking lumber rates. They were awarded damages by the Commission (142 I.C.C. 521; 182 I.C.C. 731). Suit was then brought in the District Court to recover the amounts awarded to the shippers. Demurrer to the petition was sustained and judgment entered dismissing the petition, D.C., 7 F.Supp. 593, 594. The District Court stated the question involved as follows:

"The case presents the single question of the proper construction of a rate tariff. This is a question of law, and while in such a case the decision of the Interstate Commerce Commission should be received with respect, and given that weight to which the experience of its membership in this field justly entitles it, such decision is not binding or controlling upon the courts."

49. That case was affirmed by the Sixth Circuit Court of Appeals, 82 F.2d 94, which was affirmed by the Supreme Court. In that case in the Court of Appeals, the Court said, on the question of the conclusiveness of the Commission's award, at page 95:

"The first question to be determined is the conclusiveness of the Commission's awards. If the question were one of fact, or involved the exercise of administrative discretion, we are bound by the decision. The Commission, however, was asked to construe a railroad freight tariff. No question was before it as to reasonableness of rates, and while existence of through routes was involved, there was no controversy as to the fact, and no question decided as to the reasonableness of the routes. The question was one of law, and while great deference will be paid to the Commission's conclusions, we are not bound by them. Chicago, Milwaukee & St. Paul R. Co. v. McCaull-Dinsmore Co., 253 U.S. 97, 99, 40 S.Ct. 504, 64 L.Ed. 801; United States v. Missouri Pacific R. Co., 278 U.S. 269, 280, 49 S.Ct. 133, 73 L.Ed. 322. The problem of ascertaining the proper interpretation to be given to a tariff provision is akin to that to be given any other document. Great Northern Railway Co. v. Merchants' Elevator Co., 259 U.S. 285, 291, 42 S.Ct. 477, 66 L.Ed. 943."

The Supreme Court in this case, 299 U.S. 393, 397, 398, 57 S.Ct. 265, 267, 81 L.Ed. 301, held that the construction of the tariff involved was a question of law "not differing in character from those presented when the construction of any other document is in dispute" (citing Great Northern Ry. Co. v. Merchants' Elevator Co., 259 U.S. 285, 291, 42 S.Ct. 477, 66 L.Ed. 943), and that the contrary construction given by the Interstate Commerce Commission was not conclusive upon the court. The court distinguished the case from the case of Standard Oil Co. (Indiana) v. United States, 283 U.S. 235, 51 S.Ct. 429, 430, 75 L.Ed. 999, because in that case there was required "consideration of matters of fact and the application of expert knowledge for the ascertainment of the technical meaning of the words and a correct appreciation of a variety of incidents affecting their use".

50. In the case at bar, it would seem the facts are undisputed and there is no occasion for the application of expert knowledge for the ascertainment of the technical meaning of words or of incidents affecting their use.

51. It is apparent that the facts in the case at bar are different from the cases above discussed, and the question remains whether, on the principle of *res judicata* or estoppel by judgment, this court is controlled by the decision of the Interstate Commerce Commission in the Anchor Hocking Case. See 30 Am.Jur. 178, 180; Southern Pacific R. Co. v. United States, 168 U.S. 1, 48, 18 S.Ct. 18, 42 L.Ed. 355; Grubb v. Public Utilities Commission, 1930, 281 U.S. 470, 479, 50 S.Ct. 374, 74 L.Ed. 972; Hegler v. Faulkner, 1893, 153 U.S. 109, 117, 14 S.Ct. 779, 38 L.Ed. 653; Johnson v. Towsley, 1871, 13 Wall. 72, 20 L.Ed. 485; Whitcomb v. White, 1909, 214 U.S. 15, 29 S.Ct. 599, 53 L.Ed. 889; Cromwell v. County of Sac, 1876, 94 U.S. 351, 352-353, 24 L.Ed. 195; Restatement, Judgments, Sec. 1, p. 9 (1942); Arizona Grocery Co. v. Atchison T. & S. F. Ry. Co., 1932, 284 U.S. 370, 389, 52 S.Ct. 183, 76 L.Ed. 348; Tait v. Western Maryland Co., 1933, 289 U.S. 620, 53 S.Ct. 706, 77 L.Ed. 1405; Federal Radio Commission v. Nelson Bros. Bond & Mortgage Co., 1932, 289 U.S. 266, 53 S.Ct. 627, 77 L.Ed. 1166; Davis on Administrative Law, Sec. 181, p. 612; Nachod & United States Signal Co. v. Helvering, 6 Cir., 1934, 74 F.2d 164; Stason, "The Law of Administrative Tribunals", 1936, p. 444.

52. The subject has had considerable attention in the law reviews. See Schopflocker, "The Doctrine of Res Judicata in Administrative Law", 1942 Wis.L. Review, 1; Davis, "Res Judicata in Administrative Law", 25 Texas L.Review, 199; "Res Judicata in Administrative Law", 49 Yale L.J. 1250 (1940); Griswold, "Res Judicata in Federal Tax Cases", 1937, 46 Yale L.J., 1320; Tollefson, "Judicial Review of Decisions of the Interstate Commerce Commission", 5 G.W.L.R. 503 (1937); "Administrative Tribunals—Operation of Administrative Orders as Res Judicata", 27 Mich.L.R. 677; "Administrative Tribunals—Distinction in Legal Effect Between Legislative and Quasi-judicial Orders of the Interstate Commerce Commission", 34 Mich.L.R. 672, 680; Abel, "Credit Given Administrative Determinations", 1937, 22 Iowa L.R. 461, 517; Parker, "Administrative Res Judicata", 1945, Ill.L.R. 56, 77–79.

53. It would appear from the reports that the principle of *res judicata* or estoppel by judgment applicable to decisions of the courts has not been applied to determinations of the Interstate Commerce Commission or administrative agencies generally.

54. If the answer to the question of whether a decision by an administrative agency is *res judicata* if the same issue between the same parties subsequently arises before a judicial tribunal depends on the legislative intent (see Schopflocker, "The Doctrine of Res Judicata in Administrative Law, 1942 Wis.L.R., 1, 37), it would seem that the intent of Congress, so far as the Interstate Commerce Commission is concerned, is evidenced by the provision in the Interstate Commerce Act, Sec. 16(2), Title 49 U.S. C.A., that the findings of the Commission shall be only "prima facie evidence of the facts therein stated", and by the provision of Sec. 1336, Title 28, U.S.C.A., giving the District Courts jurisdiction of "any civil action to enforce, enjoin, set aside, annul or suspend, in whole or in part, any order of the Interstate Commerce Commission".

55. There seems little question but that, if the decision of the Interstate Commerce Commission in the Anchor Hocking Case is given the same force and effect as the decision of a judicial tribunal, it would be *res judicata* and conclusive of the issue here, because the question at issue here was actually litigated and determined there between the same parties. However, we believe we are bound to follow the decision of the Sixth Circuit Court of Appeals in Brown & Sons Lumber Co. v. Louisville & Nashville R. Co., 1936, 82 F.2d 94, holding that the court is bound by the decision of the Commission on questions of fact or questions involving the exercise of administrative discretion, but that the construction of a freight tariff is a question of law and the Commission's decision thereon, though having weight, is not binding on the court. That decision was affirmed by the Supreme Court, as has been previously noted.

56. Other cases have considered this question. In the case of Sonken-Galamba Corp. v. Atchison, Topeka & S. F. Ry. Co., D.C.Mo., 1939, 28 F.Supp. 456, 461, it was said:

"* * * There have been hundreds, perhaps thousands, of cases involving freight undercharges and overcharges. Each one of these cases concerned what rate a particular shipment should pay, involved a determination as to what the commodity shipped was. So far as our research has revealed *it has never been so much as contended that a judgment in one of these cases was res judicata in a subsequent case between the same parties involving a shipment of an allegedly similar commodity.*" (Italics added.)

57. And in Segal v. Travelers Insurance Co., D.C.D.C.1950, 94 F.Supp. 123, 124, 126, in which the question presented was whether the doctrine of *res judicata*

was applicable to a determination by an administrative agency when the question subsequently arose in a civil proceeding between the same parties, the court said:

"This case presents the question whether the doctrine of *res judicata* is applicable to a determination of an administrative agency when the same issue subsequently arises in a civil action between the same parties in a judicial tribunal.

"\*     \*     \*     \*     \*     \*

"In spite of the multiplication of administrative agencies in recent years, there seems to be a strange paucity of authority on this point. Perhaps this is because it rarely happens that the parties to an administrative proceeding and to a civil action subsequently instituted, are the same. In any event, the question must be decided largely on principle, with the aid of a few sporadic expressions in the opinions of the courts.

"\*     \*     \*     \*     \*     \*

"It would seem that as a practical matter the doctrine of *res judicata* should not extend to a determination of an administrative agency if the same issue subsequently arises before a judicial tribunal. Administrative agencies proceed with varying degrees of formality. It would be a dangerous doctrine that would extend to the findings of every administrative agency the dignity and solemnity of a binding judgment, to which the principle of *res judicata* would apply." 94 F.Supp. at page 126.

58. Our conclusion is that under the present state of the law, the determination by the Interstate Commerce Commission in the Anchor Hocking Case on the question of law as to the construction of the tariffs involved here is not *res judicata* or controlling on the court in this case.

59. Another question is presented on the record by the contention of the defendant that the opinion and order of the court in overruling the motion for summary judgment is the law of the case on the question of whether or not the determination of the Interstate Commerce Commission is binding on this court.

60. The record shows that the Pennsylvania filed a motion for judgment on the pleadings, under Rule 12(c), Federal Rules of Civil Procedure, 28 U.S.C.A., "for the reason that the only issues presented by the pleadings are issues of law and these have been determined by the decision of the Interstate Commerce Commission in the matter of Anchor Hocking Glass Corporation, et al. vs. Baltimore & Ohio Railroad Company, et al., Case No. 30614 on the docket of the Interstate Commerce Commission; and that the decision of the Interstate Commerce Commission in that case is now final". This motion was overruled by the court.

61. It is contended by counsel for defendant that the law of the case with reference to whether the determination of the Interstate Commerce Commission in the Anchor Hocking Case is binding on this court has been settled by the order and opinion of the court of May 21, 1953, overruling the motion for judgment on the pleadings. However, reference to that order and opinion does not indicate the ground upon which the court overruled the motion. It had been argued by counsel for defendant (Supplemental Memorandum on Motion, p. 5) that this court could not determine "whether the plaintiff 'is entitled to a judgment as a matter of law', without the tariffs themselves being in evidence before this court", and that the defendant had "the right to offer expert evidence as to the proper construction of such tariff provisions."

62. There is nothing in the order or opinion of May 21, 1953, that indicates the court intended in this case to fore-

close the question as to the binding effect of the determination by the Commission in the Anchor Hocking Case. It may well be that the court overruled the motion, without going into the question of law involved, to give the defendant an opportunity at the hearing to offer the evidence it desired. However, our conclusion on this subject makes this question of no import.

### The Question of Construction

63. Assuming the court is not bound to follow the decision construing the tariff contained in the report of the Commission in the Anchor Hocking case, and must re-examine and decide for itself the question of tariff construction independently of any determination by the Commission, we come to the question of exactly what is the language to be construed.

64. It is hardly necessary to review the background of facts in evidence in this case and in the case before the Commission. They are not in dispute. Excepting for differences in points of origin and destination in the two cases, the findings of fact in the report of the Commission apply to this case. There is no dispute as to the facts between the experts for the plaintiffs and defendant; they differ only in theory as to how the tariffs in question should properly be construed.

65. Mr. Taylor, expert for the complainant glass companies in the Anchor Hocking case, made the same contentions there set forth in the brief for defendant (pp. 32–33) as made by Mr. Huni, defendant's expert in this case. The theory and position of the glass companies in the Anchor Hocking case, as appears from the files before us, was fully and adequately presented to the Commission. We are unable to find that any material evidence has been introduced before us that was not before the Commission in that case, notwithstanding a statement to that effect in the brief of counsel for defendant (p. 30).

### The Tariffs Involved

66. The shipments of sand here involved were subject to three types of tariffs. These were: (a) the base rate tariffs; (b) the so-called master increased rate tariffs; (c) so-called connecting link supplements, which merely connect up the master tariffs with the base rate tariffs.

67. The governing base rate tariff in effect on the Pennsylvania during the entire period covered by the shipments here involved was Western Trunk Line Tariff 41–A, ICC No. A–3593 and Supplement 24 thereto. (Ex. J).

68. The base rate tariffs in effect on the Baltimore & Ohio are not in evidence here, but it is stipulated that the commodity descriptions on sand in the base rate tariffs in effect on the Baltimore & Ohio at the time were substantially similar to those in Item 25–A of Exhibit J. (B & O Stip., par. 11).

69. Two master tariffs are involved. The master tariff in effect as to shipments moving January 13 to May 6, 1948, was Supplement No. 4 to Tariff of Emergency Charges No. X–166 (Ex. K). The master tariff in effect as to shipments moving May 6 to July 11, 1948, was Tariff of Increased Rates and Charges No. X–166–A (Ex. L). A Supplement No. 3, Tariff of Increased Rates and Charges, No. X–166–A, which restored the prior commodity descriptions on sand in the base rate tariffs, was issued June 3, 1948, effective July 12, 1948 (Ex. M), after the periods here involved.

### The Base Rate Tariffs

70. The Commodity descriptions in the base rate tariffs applicable to the shipments here in question read: (Ex. J, p. 3)

#### Item 25–A

"Column A. Applies on *Sand, moulding, bonded* (naturally or otherwise), *in all kinds of equipment.* Applies on *Sand* (except Sand, moulding, bonded (naturally or otherwise) and except ground or

pulverized sand), *in closed equipment.*

"Column B. Applies on *Sand, ground or pulverized, in all kinds of equipment.*

"Column C. Applies on Sand *(except sand, moulding, bonded* (naturally or otherwise) *and except ground or pulverized sand), in open-top equipment.* (See Note).

"Note.—Rates will not apply on shipments in cars with tarpaulin or other protective covering. In such instances the rates applicable on shipments in box cars are to be assessed." (Italics added).

71. It is stipulated that the sand here involved shipped via the Pennsylvania was shipped in closed cars or in open cars with protective covering. (Pennsylvania Stip., par. 19). It is stipulated that the sand here involved shipped via the Baltimore & Ohio, except shipments specified in Section 3 of Schedule "A" to Baltimore & Ohio stipulation, was shipped in closed cars, and that the shipments specified in Section 3 were shipped in open cars without protective covering. (B & O Stip., par. 9).

The Master Tariffs of Increased Rates

72. July 3, 1947, the railroads filed with the Commission a petition (assigned No. Ex Parte 166) seeking authority to increase freight rates, in Appendix II of which proposals were made, provisions of which are reproduced in Exhibit 5, first column, in which the commodity descriptions on sand are listed as follows:

| "Item No. | Commodity. |
|---|---|
| 247–B | *Sand* (foundry, *glass,* moulding, etc. |
| 245 ) | |
| 246–A) | Sand and Gravel, NOIBN" (Italics added). |

It will be noted that no reference is made to type of equipment.

73. The term "Noibn" was not used with reference to sand in the base tariff.

(Ex. J). Its meaning, as stated in the master tariffs, was:

"Except where otherwise specifically provided in particular terms, where the term 'NOIBN' is used, it means not otherwise indexed by name and not more specifically provided for in Tariff of Increased Rates and Charges No. 162–A as described in Item 5". (Ex. K, p. 6; Ex. L, p. 35).

It appears that "glass" sand and "silica" sand are specifically indexed by name in the master tariffs here involved (Exs. K and L).

74. September 5, 1947, the railroads filed a petition to supplement and amend their original petition in Ex Parte 166, and on December 3, 1947, the railroads filed a petition further to supplement and amend their original petition as supplemented and amended in Ex Parte No. 166, in which the commodity descriptions on sand were exactly as quoted above in their original petition in Ex Parte No. 166 for increased rates. (Ex. 5, 2nd and 3rd cols.).

75. It is stipulated that in none of the carriers' petitions in Ex Parte No. 166, to all of which plaintiffs were parties, did the carriers ask authority to make higher per cent or flat increases on sand in closed cars than on sand in open cars. (B & O Stip., par. 17).

December 29, 1947, in Ex Parte No. 166 (270 ICC, 81) the Commission granted a 20% temporary increase in basic freight rates and charges, subject to maxima on specified commodities, including sand, on the carriers' petition of September 5, 1947. Pursuant to this authority, the carriers published, effective January 13, 1948, the first master tariff of increased rates here involved, covering the period January 13, through May 5, 1948, entitled "Supplement No. 4 to Tariff of Emergency Charges No. X–166". (Exhibit K).

76. On p. 10 of Exhibit K appears the following provision with reference to maximum increases on sand, the application of which to the shipments here involved, from January 13, to May 6, 1948, is in controversy:

| Item No. | Commodity, In Carloads | Maximum Increase |
|---|---|---|
| 245 | *Sand* or Gravel, Noibn, in bulk in *open-top cars.* | 30 cents per net ton |
| 246 | *Sand* or Gravel, Noibn, *in closed cars.* | 30 cents per net ton |
| 247 | *Sand,* viz: Blast. Core. Filtering. Fire. Furnace. Foundry. *Glass.* Grinding. (Italics added). Ground. Loam. Moulding, bonded (naturally or otherwise). Moulding, NOIBN. Polishing. Pulverized. *Silica.* | 60 cents per net ton |

77. Exhibit K was succeeded by the second master tariff of increased rates (Exhibit L). On p. 41 of this exhibit appears the following provision with respect to increased rates on sand, the application of which to the shipments here involved, from May 6 through July 11, 1948, is in controversy:

| Item No. | Commodity. | Increase |
|---|---|---|
| 280 | *Sand* or Gravel, NOIBN, in bulk in *open-top cars.* | Apply Table 3, 5 or 7, as the case may be, maximum 33 cents per net ton. |
| 285 | *Sand* or Gravel, NOIBN, in *closed cars.* | Apply Table 3, 5 or 7, as the case may be, maximum 33 cents per net ton. |
| 290 | *Sand,* viz: Blast Core Filtering Fire Furnace Foundry *Glass* Grinding (Italics added). Ground Loam Moulding, bonded (naturally or otherwise) Moulding, NOIBN Polishing Pulverized *Silica* | Apply Table 3, 5 or 7, as the case may be, maximum 66 cents per net ton, but not less than 33 cents per net ton. |

78. When the original Tariff of Emergency Charges No. X–166 was published, effective October 13, 1947, the plaintiffs published Special Supplements or connecting link tariffs, so-called, which enumerated by tariff numbers the respective base rate tariffs which were increased as provided in Tariff No. X–166.

These specifically provided not only that their base rate tariffs then in effect were "increased as provided in Tariff of Emergency Charges No. X–166," but also as provided in "Supplements thereto or successive reissues thereof", by reason of which the Special Supplements became automatically subject to Supplement No. 4 to Tariff No. X–166 (Exhibit K). No question is raised as to the effect of these Special Supplements or connecting link tariffs.

79. Exhibit L was succeeded by Supplement No. 3, "Tariff of Increased Rates and Charges No. X–166–A", effective July 12, 1948, (Exhibit M), which restored the commodity descriptions on sand to the language used in the base tariffs (Exhibit M, p. 11), making the maximum increases of freight rates on sand depend upon the type of equipment used.

Referring to some of the arguments advanced by counsel for defendant:

80. 1. It is contended by counsel for defendant that inasmuch as there were no rates published in the applicable base rate tariffs on sand as either "glass" sand or "silica" sand, there were no applicable rates in those tariffs to which the maximum of 60 cents per net ton in the period January 13 to May 5, 1948, or 66 cents per net ton during the period May 6 to July 11, 1948, in the master tariffs (Exhibits K and L), could apply, and that the lower maximum rates on sand of 30 and 33 cents per net ton were the properly applicable rates.

81. That the Commission had presented to it and considered this argument is shown by its report, in which it stated:

" * * * the defendants' base-rate tariffs in effect during the period covered by this complaint contained rates on sand, with certain exceptions not here material, described in terms of the equipment used to transport it, and there were no rates published therein on sand described or indexed by name as 'glass' sand or 'silica' sand. The position of these complainants is that there were, therefore, no rates on sand in those tariffs to which the higher maximum increases on sand described in the master tariffs of increased rates and charges as glass or silica sand could be applied; that those higher maximum increases were inapplicable; and that the lower maximum increases on sand, described in the master tariff as 'sand * * *, Noibn, in closed cars', were applicable.

" * * * * * *

"The generic term 'sand' in the base-rate tariffs included all kinds of sand, except ground or pulverized sand and bonded molding sand, and therefore embraced glass sand. That this was the meaning of the term is indicated by the fact that prior to the establishment of rates on this traffic, based on equipment distinction, pursuant to the findings in Industrial Sand Cases, 1930, supra, (204 ICC, 159), glass sand generally was so described in the defendants' tariffs. The complainants' contention that the description 'sand * * *, Noibn, in closed cars', in the master tariffs of increased rates and charges was literally applicable to the rates on sand, in closed cars, published in the base-rate tariffs, is unsound. It ignores the definition of the term 'Noibn' in the master tariffs, which definitely precludes the use of such description on sand therein otherwise indexed by name, including glass sand, and would wholly nullify the master tariffs in respect of glass sand and most of the other kinds of sand therein indexed by name."

82. Counsel for defendant criticized the foregoing conclusion of the Commission on the ground that it wholly ignored Item 10–B of master tariff Supplement No. 4 to "Tariff of Emergency Charges, No. X–166," (Exhibit K, page 3, Pennsylvania Stip., par. 22; B. & O. Stip., par. 12), and Rule 1(a) of master tariff, "Tariff of Increased Rates and Charges, No. X–166–A" (Exhibit L, page 18;

Pennsylvania Stip., par. 22; B. & O. Stip., par. 12; transcript, 81–82), as to the method by which the increased rates and charges under those tariffs were to be determined. Item 10–B reads as follows:

"All charges for line-haul transportation and other services as provided in tariffs making reference to this tariff, * * * are increased in the manner specified below:

"First ascertain, *without reference to this tariff*, the amount of the charges, other than those for the services specified in the exceptions above, and then increase the amount so ascertained twenty per cent * * except that the increase in the line-haul transportation charges will not exceed the amount which would result from the maximum increase, if any, provided for the commodity, in carloads, in Items 22 through 297 of this tariff, as amended * * *." (Italics added.)

Rule 1(a) of master tariff X–166–A (Exhibit L, p. 18) is to the same effect.

83. This point was not mentioned in the report of the Commission. To what extent it was presented in the briefs of complainants in the Anchor Hocking case does not appear. It was brought out clearly in the testimony in that case of Mr. Taylor, the expert for the complainants there. It also appears, from copies furnished us of papers filed with the Commission in that case in connection with the "Petition of complainants for reconsideration by and reargument before the full Commission of the report and order of Division 3 of July 16, 1952, dismissing the complaint", that the question was there fully presented and presumably considered. That petition was denied by the Commission February 2, 1953. The principal points upon which the petition was based were (1) that the matter should be heard and passed upon by the full Commission, and (2) that the Commission report "entirely ignores and gives no effect whatever to the mandatory provisions of Item No. 10–B of Supplement No. 4 to Tariff of Emergency Charges No. 166 and of Rule 1(a) to their Tariff of Increased Rates and Charges No. X–166A." (p. 14).

84. A somewhat similar rule, having to do with the computation of increased tariff rates, was before the Commission in Great Atlantic & Pacific Tea Co. v. Atlantic Coast Line R. Co., 270 ICC, 563, 566. The rule read:

"Rule 6.—Rates determined by the amounts of other rates.

"Where the rate for a given commodity is determined by the rate for another commodity or by a specified class rate, first ascertain the rate for such given commodity without reference to this tariff, then increase such rate as provided in this tariff."

The Commission there stated, with reference to the application of the rule:

"Under the above rule, it is necessary and essential to the application of defendant's tariffs that the rates determined on other rates first be ascertained on any given commodity without reference to the tariff of increased rates, and that such rates so obtained should then be increased as provided in the latter tariff."

85. So far as appears, this may well be standard practice for the computation of increases in tariff rates, and would seem to be a simple, workable, practical formula. We cannot infer, because the Commission did not discuss the argument of counsel for the glass companies on this point, that it failed to consider it, especially in view of the fact that it was apparently the principal ground in the petition of the glass companies for reconsideration and reargument in the Anchor Hocking Case. It may well have considered a specific reference thereto unnecessary and superfluous in view of its findings and conclusions. In the case of Old Colony Furniture Co. v. United States, D.C.Mass., 1951, 95 F.Supp. 507, 510, the complaint was made that the Commission's report did not discuss the argument of the carriers based on a cer-

tain provision of the tariff involved, and the court said:

"Failure to make a complete discussion of all the testimony or arguments brought forward by the parties is not ground for holding that the Commission's order is invalid." 95 F.Supp. at page 510.

86. We see no difficulty in the application of Item 10B and Rule 1(a) of the Master Tariffs of Increased Rates (Exs. K and L) in this case, and agree with the Commission that defendant's shipments of "glass" sand were included in the commodity description of "sand" in the Base Rate Tariffs and that they were subject to the increased rates on "glass" sand or "silica" sand in the Master Tariffs of Increased Rates. To hold otherwise would be, in effect, to say that there was no tariff on glass sand.

87. 2. Counsel for defendant lay great stress upon the effect of the Commission's report and order in Industrial Sand Cases, 1930, 204 ICC, 159 (Penna. Stip. p. 7, par. 25; B & O Stip. p. 5, par. 15), and the omission in the Base Rate Tariffs of any such commodity description as "glass" sand or "silica" sand, which purported to be "issued in compliance with the order of the Interstate Commerce Commission in ICC Docket No. 22907, dated October 8, 1934" (Penna.Stip., p. 6, par. 23; B & O Stip., p. 4, par. 3); and that Appendix IV, page 193 of the Commission's report and its order of October 8, 1934, in ICC Docket No. 22907, required that

"In the governing tariffs, ground or pulverized sand, other *silica* sand, and naturally bonded moulding sand, may be so described. Other sand * * * shall be described simply as sand without qualifying adjective". (Ex. N; Penna.Stip., p. 6, par. 24; B & O Stip., p. 5, par. 14).

88. It is contended by counsel for defendant that the above action of the Commission is conclusive against the tariff construction for which the plaintiffs contend. However, it would seem (1) that the words "other silica sand" in the order of the Commission are broad enough to cover the description of the shipments in this case and the use of the words "glass" and "silica" sand in the Master Tariffs of Increased Rates (Exs. K and L), and (2) that, to the extent that the report and order of the Commission seem inconsistent with the determination of the Commission in the Anchor Hocking Case, or the commodity descriptions of the tariffs here involved, the Commission is not bound by a prior finding or order relating to a tariff rate or other administrative matter. As was said in the case of Chicago, B. & Q. R. Co. v. United States, D.C.Ky., 1945, 60 F.Supp. 580, 583, a three-judge court consisting of Hamilton, Ford and Miller, JJ.:

"It is well settled that orders of the Commission are not res adjudicata for 'no extensive rate structure can be made perfect nor can any rate structure be made permanent in any real sense in a changing world', Board of Trade v. United States, 314 U.S. 534, 544, 62 S.Ct. 366, 371, 86 L.Ed. 432, and therefore 'this court has no concern * * * with the alleged inconsistency with findings made in other proceedings * *.' Virginian Ry. Co. v. United States, 272 U.S. 658, 665, 47 S.Ct. 222, 225, 71 L.Ed. 463."

89. On this point it may be pertinent to quote from the case of Churchill Tabernacle v. Federal Communications Commission, 1947, 81 U.S.App.D.C. 411, 160 F.2d 244, 246, where it was said:

" * * * This we think follows from the well settled doctrine that res judicata and equitable estoppel do not ordinarily apply to decisions of administrative tribunals; for such tribunals are in this respect— and in many others—*sui generis,* and this the Supreme Court has emphasized in warning us that we may not transplant into the realm of administrative law rules of procedure, trial and review which have evolved in the history and experience of courts. Though the reasoning in this respect may be tenuous, we are

in duty bound to give it effect, and accordingly to *hold that the Commission is empowered to establish a new policy, and apply it to the renewal of an old license, despite the fact that it is inconsistent with a previous decision.* * * *" 160 F.2d at page 246. (Italics added.)

90. If the Commission had authority and jurisdiction under the law to fix tariff rates on sand and to direct the descriptive nomenclature to be used with reference to the different kinds of sand, or to fix rates on sand based on distinctions in equipment used to transport the commodity, it had the same authority and jurisdiction to change the bases for increased rates. We have found no authority to the contrary.

91. 3. Counsel for defendant in their brief call attention to the fact that plaintiffs have stipulated that, effective July 12, 1948, they voluntarily removed the commodity descriptions of "glass" and "silica" sand from the Master Tariffs, and published instead and in all succeeding Master Tariffs commodity descriptions exactly corresponding to the commodity descriptions on sand in their Base Rate Tariffs, after defendant and other shippers and receivers had resisted payment of the increases here sued for, and that this indicates the carriers made a basic mistake in the first place in their petitions to the Commission for the increased rates.

92. There is no evidence in this case as to why the change back was made. There may have been a number of reasons, and we cannot infer that it was because the carriers desired to rectify an initial mistake. As was said in the case of Southern Pacific Co. v. Lothrop, 9 Cir., 1926, 15 F.2d 486, 487:

"Neither do we attach any significance to the fact that as of November 1, 1923, the carriers abandoned the alternative application clause in controversy. To avoid the peril involved in the possibility that the courts would take the view here contended for by the defendant in error, *they had the right to abrogate the clause, without impliedly admitting the validity of such a contention.*" (Italics added.)

93. The existence of "glass" sand or "silica" sand as a commodity classification and description was long recognized as a basis for fixing tariff rates. (American Window Glass Co. v. Western Maryland R. Co., 51 ICC, 704 (1918); American Window Glass Co. v. B. & O. R. Co., 155 ICC, 301 (1929); Industrial Sand Cases, 1930, 188 ICC, 99 (1932); Industrial Sand Cases, 1930, 204 ICC, 159 (1934).

94. It is apparent that "glass" sand is a more specific description than "sand". It seems to be the law that where a commodity is included in more than one tariff designation, that which is more specific will be held applicable. United States v. Gulf Refining Co., 1925, 268 U.S. 542, 546, 45 S.Ct. 597, 69 L.Ed. 1082; Pillsbury Flour Mills Co. v. Great Northern Ry. Co., 8 Cir., 1928, 25 F.2d 66, 69, 70; Gideon-Anderson Lumber Co. v. St. Louis Southwestern Ry. Co., 8 Cir., 1937, 88 F.2d 232; Boone v. United States, 6 Cir., 1940, 109 F.2d 560, 562.

95. It also appears from the reports of the Interstate Commerce Commission that the tariff rates on glass sand are justifiably higher than on common sands. In the case of American Window Glass Co. v. B. & O. Rd. Co., 155 ICC, 301, supra, the Commission said:

"* * * the contention that higher rates on glass sand than other sand are unlawful because based on the use to which the commodity is put cannot be sustained. Rates on a particular commodity may not vary according to the uses to which it is put, but *among other things the use of a commodity may be properly taken into consideration in determining the measure of the rate thereon * * *. In view of the greater value and greater service incident to its transportation, sand of the kind known to the trade as glass sand may properly be regarded as a commodity different from bond-*

*ing or structural sand, and the transportation charges thereon should be somewhat higher than on the lower grade sands last mentioned."* (P. 309). (Italics added).

96. See, also, Industrial Sand Cases, 1930, 188 ICC, 99, 109, supra, as to comparative needs of the industry and bases for higher rates on glass sand.

97. In construing the tariff, some general rules should be taken into consideration. On this subject it was said in Western Grain Co. v. St. Louis-San Francisco Ry. Co., 5 Cir., 1932, 56 F.2d 160, 161:

"Further, tariffs having as they do the effect of law, the language in them must be construed fairly and reasonably, and in accordance with the meaning of the words used, and not distorted or extended by forced or strained construction."

98. And in Peterson Biddic Co. v. Chicago, B. & Q. R. Co., 155 ICC, 376, 377, the Commission said:

"It is a well understood principle that in ascertaining the meaning of the language of a tariff, the object sought to be accomplished is to be considered, and if the language is fairly susceptible of reasonably plain meaning, that construction should be put thereon."

99. We are of the opinion that the Interstate Commerce Commission was correct in its construction of the tariffs involved, and that the plaintiffs are entitled to recover from the defendant as prayed for.

No. 6315:

J. S. Rhinefort, Toledo, Ohio, for plaintiff.

Welles, Kelsey, Fuller, Coburn & Harrington, Toledo, Ohio and John F. Finerty, New York City, for defendant.

No. 6339:

Shumaker, Loop, Kendrick & Winn, Toledo, Ohio, for plaintiff.

Welles, Kelsey, Fuller, Harrington & Seney, Toledo, Ohio and John F. Finerty, New York City, for defendant.

KLOEB, District Judge.

This matter comes before the Court on defendant's objections to. the report of the Special Master; on defendant's motion that the Master's report be remanded to the Master for four specific reasons set forth in the motion; on plaintiffs' motion that the Court adopt the recommendation of the Master and that plaintiffs be given a judgment against the defendant for the respective sums prayed for; and on defendant's motion to strike the respective answers of the plaintiffs to defendant's objections to the report of the Special Master.

On consideration thereof, the Court overrules defendant's objections to the report of the Special Master; overrules the motion of defendant to remand the Master's report to the Master; and overrules defendant's motion to strike the respective answers of the plaintiffs to defendant's objections to the report of the Special Master.

Plaintiffs' motion to adopt the recommendation of the Master in these causes is sustained and judgment may be entered for plaintiffs and against the defendant, to-wit: in favor of plaintiff The Baltimore and Ohio Railroad Company for the sum of Five Thousand, Seven Hundred and 36/100 ($5,700.36) Dollars, with interest, and in favor of The Pennsylvania Railroad Company for the sum of Two Thousand, Five Hundred Eighty-eight and 66/100 ($2,588.66) Dollars, with interest.

Orders may be drawn accordingly.